The Honorable, the judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable of the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and its Honorable Court. All right, be seated, please. All right, the first case we're going to hear is United States v. Njin or Nji. I'm not quite sure how to pronounce the name. Well, you guys will clarify that. Trotten, we'll hear from you first. Thank you, Your Honor. I'm Erin Trotten on behalf of Wilson Tita. Good morning, and may it please the Court. And, you know, if you just speak up a little bit, that'll help. Thank you, Your Honor, I'll do my best. As if we're across the room, we are. So, as a matter of housekeeping, I will be addressing some of the sentencing and sufficiency issues common to all three defendants, Mr. Tita, Mr. Nji, and Mr. Fongu. My colleague, Mr. Wagner, will be addressing the issues related to the jury instructions. My colleague, Mr. Isley, will be addressing the issues related to the exclusion of the defendant's expert. As to the other issues, because this case involves so many issues and we have such a limited time with you, we'd like to stand on the briefing. At the risk of beginning at the end, I'd like to start with Roger Singletary error, just briefly, because I think that's the most straightforward issue we have here. In this case, the district court included in the written judgment two conditions that did not pronounce orally at sentencing. It required in the written judgment that the defendants report to the probation officer when they lose their jobs or if they lose their jobs and permit probation to remove any items that are prohibited by the conditions of supervision. This is Roger Singletary error. These were conditions that were not pronounced at sentencing. They are additional substantive requirements on the defendants that are not clarifying conditions. The district court did not incorporate by reference the standing order of the District of Maryland. Although the courts can do that, it must be done explicitly and it was not done. The court did refer to the standard conditions and we do have cases saying that's sufficient to incorporate. I think your problem is, not your problem, what's slightly different about this case is that after mentioning the standard conditions, the court went on to, as he said, to kind of summarize them. Exactly, Your Honor. So I think this case really is more like Bullis where the court said standard conditions but then went on to pronounce a number of conditions that really are at odds with the standard conditions. But they're not at odds, right? I will tell you my concern is we have a decision from last year, United States v. Turner, that was kind of similar and we said we really don't want to fault the district court for after incorporating, kind of going further and offering the extra protection of at least outlining the conditions for the defendant in court. And then if you give a little more detail in the written judgment, you're just sort of clarifying the summary you provided in court. So two things, Your Honor. I think, one, under the court's jurisprudence, this is not more detailed. These are not clarifying conditions. They're not fairly implied from the statements that the court made in court saying maintain employment does not give defendants fair notice that they have to notify probation 10 days in advance of changing jobs or at the minimum 72 hours afterward. Defendants can be violated. Yeah, no question. I mean, the court said at one of the sentencings, I'm going to summarize and what the defendant got in open court was only a summary. There was additional detail that was added substantively in the written judgment. I agree with you on that. And I think in both Mr. Fungus and Mr. Njie's sentencing, the district court went on to say in terms of standard conditions and then went on to pronounce these other conditions that didn't incorporate this requirement. And Mr. Tito's... I gather your position would be then if the court had shut up after just adopting the standard conditions, it would have been better than the court having explained a few. That is actually consistent with the court's statements because in that... I don't quite understand the logic of that. In other words, the standard conditions are adopted, the defendant and the counsel have those available that they were in the pre-sentence report, and the court explains them and not inconsistently. It doesn't try to change them, but explains them, at least I didn't see any inconsistency. You're saying that explaining some to the defendant somehow overrides the adoption of the standard conditions? In United States v. Bullis, what this court said was where the district court says something that might be termed incorporating the standard conditions. Now in Bullis, I think it's clearer. In this case, it simply said in terms of the standard conditions and then went on. But there's a conflict where the district court then pronounces conditions that are different from those standard conditions, which is what the district court did here. That confusion... For better or worse, we've gotten ourselves into a position where this is like a pretty fact-intensive inquiry and you have to really look at the transcript and see if it is clear what's going on. I just thought in looking at these transcripts, this struck me as different from Bullis. It seemed pretty clear that the district court was incorporating the standard conditions and then running through them more briefly than one would if you were reading them verbatim. But that's the point of first incorporating, you know where to look for the details, and now I'm just going to give you kind of a rough sense of what the conditions are in case there's any objection. I understand the court's point. I would just say that incorporation of standard conditions is required by this court's precedent to be explicit. Where the court just mentions standard conditions and then goes on to say standard conditions, any reasonable hearer would assume that the standard conditions that the court is saying are the standard conditions. The standard conditions for the District of Maryland are not actually required to be included in every case. So that's another way in which this case is actually. So our position is if you look at the transcript, you will see that they were not explicitly incorporated by reference. I want to touch on sufficiency because our time is so limited here, and I'd like to focus on sufficiency with respect to the mens rea aspect of count four, which is really the defendant's argument. Obviously while this court has to- Which one was count four? Count four is the obliteration of serial number count. So the defendants lacked the knowledge. The government hasn't shown that the defendants knew that the serial numbers were obliterated. And here I think really the question for the court is what are the reasonable inferences that the court has to take in the government's favor? Because under the standard, the court gives the government the benefit of reasonable inferences. What the government I think is asking for here are more speculative leaps than reasonable inferences. The government leans heavily on the proximity of the defendants to Mr. Muma, who was the gentleman in the basement who was grinding off the serial numbers. But the evidence that was actually submitted does not support the weight that the government places on it. Mr. Muma, first of all, the basement's not three meters square, and the court should look at Exhibit 22, which is the video of the basement. It makes it plain not only that the basement is a good deal bigger than three meters square, but that in addition there's a wall between where Mr. Muma was working and where Mr. Nji and Mr. Fongu were working refurbishing ammunition, such that when Mr. Muma is working- I understand all of that, and that sort of myopically focuses on a particular action being taken during- I think they said it takes five minutes to do one. But the bigger picture is almost- it's completely hard to overcome. These defendants met multiple times every single week over a long period of time, carrying on a function of trying to get weapons to Cameroon in a concealed fashion. They have bylaws. Everything's confidential. They understand that the guns can be traced back, and that caused problems, and they had to obliterate the serial numbers. The serial number obliterations are big, coarse obliterations. You see the pictures, and it's three or four inches long. You can't miss it when you look at the firearm. These people were packaging the firearm, concealing the firearms, handling them, renovating bullets. This was going on for months. It's a common effort in a closed place and just a few people. It's just hard to fathom that somebody didn't know what was going on, or I don't know if you're arguing that Pinkerton was foreseeable as part of the conspiracy, but it seems to me that the jury could apply normal common sense and inferences from all of that to say everybody there knew what was going on. I think it's an uphill battle when the jury is making that finding. You don't agree, but I'm giving you my reaction to it. I understand, Your Honor, so you've said a lot, and I'd like to try and unpack some of that if I can. First of all, you talked about how the defendants were meeting and they were working collaboratively, and there is a lot of evidence about this group. To be clear, there's no dispute that the defendants knew they were sending, or they were part of this group that was sending firearms to Cameroon. The issue is did they know that those firearms had obliterated serial numbers? Now, in all of the evidence ... Well, except did they know what the nature of the whole operation was. The whole operation was high confidentiality. They had bylaws they actually passed. They controlled who came in and who knew about things. They knew they couldn't have the guns retraced back. That was actually explained. They prepared these guns daily. This wasn't one incident of missing a five-minute grinding. This is a routine thing done for all the guns. How many times it happened? Thirty-five times at least, maybe many more. We don't know how many guns have been shipped in prior times. These guys are there, what, three times a week, four times a week in that small basement? I saw the video, and I think it's a hard case to make. I think the jury saying, you're sitting in a room and you're all coloring, and one guy's looking at the wall and coloring a picture. The question is, did you know anybody else in the room was coloring? He said, no, I was looking at my own picture, even though there are other children behind him coloring. What are they doing? The markings, this is not a small thing. You don't have to just hear the grinding. You can see the gun. The marking is big, and it's ugly. It defaces the firearm, and the markings are big. I saw the pictures and thought, how could anybody miss that the serial numbers were not ground off? I see my time is up, but may I respond? With respect to your question about the markings, first of all, on the guns, I think the government relies on this, but when you look at what the government found when they raided the basement, none of the guns that were in the basement had, there's no evidence that the serial numbers on those guns lying around were obliterated. I don't think that we know that, and the government hasn't offered any evidence, that the guns that were in the basement that the defendants might have seen had obliterated serial numbers. We don't know where in the process that happened. The government has access to the universe of information about the conversations between these gentlemen. They have all of the communications, all of the group messages, and they have as cooperators the two people who are most involved in the obliteration of serial numbers, Mr. Mumma, who did it, and Mr. St. Michael, who was the gun guy for the group. They could have offered testimony about any of these things, about any communications, about any of this, but if you'll notice, there is no testimony, one, that they directly discussed this, two, that the group discussed as a general matter the need to obliterate serial numbers or the need to be cautious about serial numbers in Cameroon. When you look at the interest and concealment that the defendants had, they're really interested in two things. They're concealing their activities in the basement and what they're doing in the U.S., and they're concealing the shipment, but there's no interest in concealment in the group at large. There is a manufacturing process that has been repeated and repeated and repeated, and the evidence allows inference that all of them knew what was going on in that basement on a regular basis, and all the firearms that were recovered had obliterated serial numbers. And it seems to me it's part of the process of their whole function of supporting the Anglophone side in the Cameroon dispute. But anyway, I hear what you're saying, and what we have to worry about is did the jury have enough to make that decision. And if I might just make two more points, Your Honor, in response to your comment. First of all, it wasn't all of the firearms. There were a few firearms that did not have obliterated serial numbers. But I think more broadly, your concern about they must have all known because they were in the basement doesn't hold up when you realize that something like 0.2 percent of the time that Mr. Mumma spent in the basement was time spent grinding off the serial numbers, taking all of the possible inferences. But it was repeated for every gun, and it was a loud grinding noise, and this is an operation. How many steps in preparing these guns was there a loud grinding noise except with respect to the, I mean they weren't sawing off the tips of the shotguns with saws. There's a lot of common sense. I mean, I know you would like to focus on a five minute effort and say that five minutes is a small percentage of the whole time they were there, but I'm not sure that's the way we look at things when we experience them. But I think your time is up, and we'll take it up. I guess you have some rebuttal on that. Thank you, Your Honor. Mr. Wagner. Good morning, and may it please the Court. I'm Rob Wagner. I represent Mr. Najee in this case, and I'll be addressing the jury instructions, instructions that were read to the jury at the conclusion of the evidence in this case. And it's important to reflect, Your Honors, on the nature of this conspiracy and the nature of what these folks were doing. They were documenting just about everything, and they were communicating on a regular basis about everything that was going on. And if you look through all of the e-mails, all the texts, all the social media, voicemails, letters, writings, if you look at the co-conspirators and their statements about what was going on here, the discussions that they were having, there is no specific reference to serial numbers. There's no specific reference. They're using code. They act in confidence. They have words that substitute for other words. But they didn't describe the process, how they did ammunition and so forth. This is a detail in the manufacturing process. But regardless, what is your objection? I mean, both of the instructions were accurately described at all, right? No question, Judge. Okay. So your objection is that they gave a Pinkerton instruction because cutting code, grinding off codes was not a foreseeable function of the conspiracy. That and several other things. It wasn't just the serial numbers charged that the jury was provided under Pinkerton. It was counts two and three as well, the export counts as well. This was a complex case. You're suggesting that there was no evidence that these people knew that this stuff was going to Cameroon? Oh, no, no. Not at all. The jury found them not guilty of those two counts, Judge. No. Well, I understand. What I'm suggesting is there was insufficient evidence that they were aware of the grinding of serial numbers. And I know you've hit on that. But more importantly, Judge, this was a toxic combination of instructions. You've got Pinkerton, which allows for vicarious liability of underlings of the principles in this case. And that's unusual. And then you've got the willful blindness instruction on top of that. And you've got a conspiracy instruction that allows inferences in the case, inferences that can be drawn. And then you've got an aiding and abetting instruction on top of that. These defendants had no actual engagement, actual participation in the serial numbers, in the obliteration of the serial numbers. Yet they're being held vicariously liable through the Pinkerton instruction, through the willful blindness instruction. And I think we need to look at this case and these defendants in that proper context. Now, the case law that I cited in my briefs discusses Pinkerton and discusses that generally speaking in a Pinkerton case, you've got a principal who's being held liable for the conduct of the underlings. Here we're reversing that. Here the government and the district court has instructed the jury to find vicarious liability, Pinkerton vicarious liability, for the agents from what the principals knew. And not only do you have the reasonable foreseeability standard for Pinkerton, but you've got a standard that allows for... Judge Harris? Judge Harris. I'm sorry. How do we know who are the agents and who are the... I'm sorry, I can't... Well, I thought part of the case that was made to the jury was that this is like a very non-hierarchical kind of a conspiracy. It was these 10 guys. They were social friends, had all sorts of ties to each other and they kind of were all in it together. Well, I think it's clear that St. Michael, the man who owned that house and who controlled the operation, he was overseeing everything. He gave Mooma, Mr. Mooma was perhaps the principal witness for the government. Not perhaps, he was the principal witness for the government about the obliteration of serial numbers. And so you've got St. Michael giving instructions to Mooma, and then you've got these guys who weren't even involved in the obliteration of serial numbers. And I would suggest that they didn't specifically know of the obliteration of serial numbers, nor even that it was reasonably foreseeable, because there was no discussion of that. And it was in a separate space from where they were working. And the timing of when they were there wasn't clear, but you also... Wasn't there even evidence from Mooma that he was instructed to grind off the serial numbers in the earshot of the other twos, that they would have heard the instruction? Yeah, but he said that they weren't... Wasn't that evidence in the record? Oh, no, that is in the record, Judge, that they were perhaps there, but... And if they hear the instruction to go to Mooma to go off and grind the instructions, don't they assume that he then went and ground off the serial numbers? But Mooma specifically said that he couldn't testify, he couldn't present evidence to the jury that they heard what Mooma... He said it was an earshot, they could have heard, they were right there. Could have heard it, right, right. And I don't think we should be arresting... This is not a large group of people there at the same time. No, no, that's clear, but it was a finite number of guns that were involved, and he said that at most he grinded, what, 10, less than 15, more than 10 firearms at between three and four minutes and five minutes for each of those firearms over a period of time. Just going back to sort of the nature of the conspiracy, I mean, it does seem as though nobody was making any effort to keep the grinding part from the other members. I feel that given the government's case at trial, why is it unreasonable for a jury to infer that because the instructions about obliteration were given in front of other members of the conspiracy and the grinding was done in front of other members of the conspiracy, why isn't it a reasonable inference that all of the members of the conspiracy knew what was going on? There was no effort to sort of hide this off. I understand your point, Judge, but if you look at the exhibits in the case, and if you look at where the toilet was, where the grinding tool was, and they talked about a tire next to the toilet, and on that tire, that's where the grinding was, you can't see that tire, you can't see that toilet. No, but if it's a secret from the other members of the conspiracy, from what I can tell from the video, there's not even a door. No one is making any effort to keep this quiet. But there are a lot of other things going on. It's not just the grind, there's the packaging of the ammunition. They're actually supplying legitimate humanitarian aid to their countrymen back in Cameroon. They're providing diapers, they're providing vehicles, and blankets, and clothing.  I'm sorry? In the basement there? Well, that was being packaged. No, no. We're talking about what's going on in the lab. But we're talking about packaging generally as well, and what was going into the storage container that was being sent to Nigeria. Sure. That's like saying what they had for lunch upstairs. We have this fairly small confined room, very congested, a few people in it, and they're doing various functions together to get these firearms prepared and packaged and concealed, heavily concealed and packaged. I think down there, didn't they actually put it inside some kind of a tank? A container, yes. And welded it closed? That's true. I mean, doesn't everybody know what's going on? I see my time is up, Judge, if I may respond to your question. You know, yes, in terms of packaging firearms, in terms of packaging ammunition, in terms of sending these materials overseas to the continent of Africa, yes, everyone knew. But you can't extend that to knowledge of the continent.  Thank you. All right. I guess Mr. Isley, we'll have you. Thank you. Good morning, Your Honor. May it please the Court. My name is Justin Isley. I'm from the Sadiq Law Firm, and we're here on behalf of Mr. Fongu. We're here to argue the point about the complete exclusion of defense expert Effie Timbon. Our clients were clear in their reason for presenting this expert, to educate the jury in the ongoing conflict that involved violence against certain citizens of Cameroon by their government, and to explain why people making What is the relevance? In other words, your expert was going to suggest, at least the Court was worried about it, that supporting one side of a conflict in Cameroon was a justification, something that would legitimize the conduct, and the Court thought that was going to cause confusion. The Court let the information in through other witnesses, but the Court excluded the expert, which would highlight and focus on the dispute in criminal code. It's a discretionary decision, and the Court's making this assessment, and you got that evidence in through other witnesses. Your Honor, it is an abuse of discretion standard. However, the law has to be followed. The expert testimony was not in violation of What law was violated? Your Honor, the expert witness would have provided No, what law was violated? The rules of evidence were not followed by the trial court. Our expert, despite having a point of view, was appropriate expert evidence, and it was necessary because our client's defense needed this. The government was arguing that our client's concealment of actions in this entire case as a proxy for the proof of their mens rea, for a guilty mind. And our clients have a right, not just to make them do it through their own testimony, but to have expert testimony that can, if the jury believed, could lend them to believe that our client's point of view on their mental state, the reason for concealing was not to hide against the United States. Government experts do it all the time. The mental state is knowingly, but there is no, I don't believe, maybe you can point it out, but I don't think there's any justification defense because you're supporting a legitimate revolutionary movement. Your Honor, our expert meets the criteria for expert witnesses under the protocol, and the recent case in Diaz shows that our experts were well within the protocols. When a government expert, this case, as your Honor's know, came out while this was on appeal, a government expert was able to testify that most people in a group, that included the defendant in that case, share the mental state and that this did not violate Rule 704, because 704 only allows for the defendant's mental state to be excluded. Our expert was not going to testify about what our client's mental state was. It was just going to lend evidence and credibility to their point of view. Was there any dispute that you guys had these bylaws, that you had the overall effort to support the revolutionary, the anglophones? It seems to me that the jury knew exactly what they were doing, but there was no suggestion that that justified. Clearly that's why they were doing it, but at the same time they were doing it knowingly, and the knowingly aspect violates American law. To the extent the court excluded this expert under 403, when there is probative value to the evidence, this court has said and other courts have said several times that you lean to introduction of the evidence. That's because we have, and I quote, vigorous cross-examination. What is it going to prove? It's a presentation of contrary evidence and careful instructions on the law. You said it's probative evidence. It's probative evidence. The government is saying that all the actions that our clients were saying is a process for their mental state. I'm asking you, what is the expert going to prove? The expert is going to provide relevant evidence about the ongoing conflict that shows that people would suffer retribution from actions from the government if they were found out. And our clients testified, Your Honor just said previously, that this already came in through our clients. They said that they were worried about the camera. I understand, but I don't understand why the expert was needed to put that in. I don't understand how that relates to an element of the offense. It's the guilty state of mind. It's the mens rea. What is the mens rea? They have to prove that our client's intent was to conceal these things from the U.S. government. No, they didn't. It had to be knowingly concealed. Deliberately concealed. When government experts testify. Not conceal. It's basically to obliterate. Knowingly obliterate the arms. Knowingly export the arms. Possess the arms. Your Honor, when government experts testify, and I would like to finish up with this, when government experts testify, it's not because it's necessary. It's not because the evidence isn't already in. And I'll give two quick examples. We see this in drug cases. Government experts of this type, non-scientific ones, are allowed liberally. We have them, as in the Diaz case, or drug experts. Almost in all cases in those times, you will have the elements proven through cooperating witnesses and other testimony. So they don't need the gang experts to say, this is what the code is, this is what that is. Your Honor, in the same context, would say, well, that should be cumulative. Okay. You also have sexual abuse cases where the victim testifies. Maybe they have some inconsistency in their statement or they're delayed reporting. But they've laid the elements of the offense. But you still allow government experts to come in and testify about maybe why the mental state of that victim, delayed reporting, or other things. Okay. I think your time's up. You can cover the rest on rebuttal. Ms. Munoz?  May it please the Court, N.J. Kirsch Munoz for the United States. The defendants take aim at pretty much every... Keep your voice up. The defendants take aim at pretty much every aspect of the pretrial, trial, and sentencing proceedings below. But this scattershot approach cannot disguise, much less overcome, the correctness of the district court's rulings and the integrity of the jury's guilty verdicts. You know, guilty verdicts that, like any jury verdict, demands deference under the Rule 29 standard, which sets up an enormously high burden for the defendants here. And because we believe that the defendants come nowhere close to carrying this burden, we respectfully ask the Court to affirm. And unless your honors have a preference otherwise, I think I'd like to start with where your honors left off on the issue of excluding Mr. Tenbon's testimony. And I think there's really no question that the exclusion of Mr. Tenbon's testimony was at least within the discretion of the district court here, if not entirely the correct call. And there are two points I want to emphasize on this topic. The first is that despite what defendants now argue, they gave the Court almost no sense, no real proffer about what Mr. Tenbon was going to say. In fact, the Court really only had two sources that abstractly described what Mr. Tenbon's testimony was going to be. That would be a single sentence in defendants' four-page notice, which is at page 134 of the appendix, and Mr. Tenbon's congressional testimony that was attached to the notice. And both of those sources, if one were to read them, I think entirely confirm the district court's judgment to exclude this testimony. And so I just want to make that point totally clear that although defendants now say, oh, Mr. Tenbon wouldn't have testified like he did in his extremely partisan congressional testimony, oh, and Mr. Tenbon would not have invited the jury explicitly or implicitly to pick his side in the Cameroonian conflict. That was by no means apparent to the Court as it was ruling on defendants' notice. And so I think the Court's concerns about confusing the jury with some sort of sideshow about who was right and who was wrong in this conflict were very real. And those concerns alone justify the Court's decision to exclude Mr. Tenbon's testimony. But my second point is that on top of this tendency to confuse the jury about what was really at stake in this case, Mr. Tenbon's testimony really had very little probative value. The government is not disagreeing that it was in some abstract way relevant. The district court also agreed that it was relevant, and that's what the 403 standard actually sets out. If there's relevant evidence, should it still be excluded when balancing the probative value over the tendency to confuse jury, mislead, prejudice, et cetera? And how would it have confused the jury? So, Your Honor, the district court found that the testimony that would most likely include a lot of description of the violence in the Cameroonian Civil War would create a little bit of a sideshow, a mini-trial about the different sides in that conflict, who was right, who was wrong. And I think the Court was also extremely concerned that by, you know, allowing the jury to, you know, identify with one side in the conflict, they would... But wasn't the government's theory about the Pinkerton and all those things that everything that was done must have been a natural consequence of a foreseeable act, like the grinding, because they wanted to hide from prosecution in terms that they knew this was against federal law. Wasn't that your theory? That's why everything that was done in the room... Well, you must have known that because you want to grind the guns down because you want to conceal the crime. Wasn't that your theory to the jury? The defendant's theory was that... No, not the defendant. The government. Wasn't that your theory? The government's theory was that... And you wanted to paint a picture that these people in this room, they would do whatever was necessary to conceal everything. That's why they must have known that they were grinding these serial numbers, they were doing all these things for that purpose, right? A nefarious purpose of, you know, just hiding themselves because they didn't want to be prosecuted or be caught in violating the federal law. Correct? Yes. That is the government's theory, yes. Well, then why would it not be appropriate for the defendant to say no then if you open that door and say, wait a minute, no. Even though it's not a legal defense in a sense, perhaps, maybe not. But no, there's a conflict going on and there's dangers related to that aspect of it and not wanting to be, right, to be brutalized by the other side in that war. Why wouldn't that give another context to it? So otherwise the government can put all these things on a negative and give that idea, but they can't put on a different perspective of it? Why not? Well, Your Honor, I think I have two points there. Yes, please. The first is that the defense did, in fact, put on plenty of evidence, plenty of testimony from certainly the two defendants who did testify as well. A bit more than an expert. Everybody knows that an expert does better, right? A lot of people say, well, a lay person could have talked about this, but yeah, but an expert, they get the jurors' attention, right, because they're the only ones that are allowed in the court to give an opinion. Everyone else is a fact witness. They can give opinions. That's what makes them different in terms of, I know you're a good trial lawyer, you know that. Experts, that makes the difference because jurors, they know if you do a good job as a litigator, they sit up to an expert because they're qualified by the court to give an opinion. Why should they be bereft of that? And you can paint this picture of these people just concealing everything because they're criminals, just like anybody. You treat them like, well, these are like drug cases, you know, they're always trying to get rid of the stuff, what they're cutting it with, what they're doing with their supply, who to connect it. No. But he was saying that there's something that's beyond that. It's the whole thing to motivate in terms of what's going on, the atrocities or whatever that they're dealing with and where they are. Why would that be confusing and why would that not be? I don't understand that. So I think the district court's ruling, aside from the tendency to confuse the jury, was just that there was really no need for an expert to establish the kind of facts that the four page notice of expert testimony said Mr. Tembon would do. You know, that notice said and I quote, the testimony will explain to the jury that the Cameroonian government has been involved in armed conflict with anglophone Cameroonians since at least 2016. And that's it. And that's all it said. And I think the district court was well within its discretion to say, okay, the fact that there's a civil war in Cameroon is relevant. The fact that the government the Cameroonian government retaliates against people is certainly relevant but defendants don't need an expert to establish these facts. A jury is perfectly capable of understanding on its own the concept of retaliation the concept of why someone who is arming a foreign militia insurgents against the government wouldn't want the foreign government to know that they were doing that. And so I do think that that is certainly a ruling within the district court's discretion and I think that's another reason why perhaps the government's expert witnesses in gang cases are a little bit different. I think gang experts typically opine on things that are clearly not within the reach of the average juror. We're talking about jargon, symbols. Do you think the average American knows about what's going on in African conflict? Sorry, I missed that. Do you think the average American knows what's going on in African countries in conflict? Do you think that? No, I don't think that, Your Honor. Well, that's what you use as the reason why we need an expert for the government about drugs, didn't it? I'm just trying to follow your logic. So, again, the fact that a civil war is ongoing in Cameroon, there was plenty of evidence in that by the defendants. By whom? By defendants' witnesses, Mr. St. Michael, as well as the government's witnesses, Mr. Acom, Mr. Mooma. But not an expert, though. They wouldn't allow an expert. That's correct, Your Honor. So why would that be confusing to have an expert? I think the judge was concerned, as I said, that this would sort of devolve into a mini-trial about the purity of the defendants' motives and sending it to the, quote, right side of this Cameroonian conflict. And I think that a jury or, rather, an expert wasn't needed to establish the pure fact, as, again, the notice said the testimony would, the pure fact that there is a civil war in Cameroon. I mean, that was undisputed. And the district court allowed plenty of room for testimony on that point to come in. And so I do think that's, as I mentioned before, maybe one reason why gang expert testimony is a little different. The handshakes its members use, the jargon, symbols, tattoos, those things aren't within the reach of the average juror. I think most people, on the other hand, are fully capable of understanding that a government in the middle of a civil war wouldn't treat kindly people who are on the side against which the government is fighting. And I think I will also given that I've already spent ten minutes on this topic, I would like to address the sufficiency of the evidence on Count 4 which is the obliterated firearms count. And I think, you know, I think Judge Niermeyer has it right. The evidence was more than sufficient for a juror to reasonably infer that defendants had actual knowledge of the obliteration of the firearms or at least that they deliberately avoided knowledge of it. And, you know, I would of course rest or maybe not rest, rather, but just repeat the framing here, which is the Rule 29 standard, every presumption in favor of the jury must be indulged. All inferences from the evidence must be construed in the government's favor. And after all that, after all the presumptions have been applied and all of the inferences have been drawn, you know, the jury verdict must be upheld unless no rational fact, not a single one, could have done guilt on all the essential elements beyond a reasonable doubt. And so, you know, the government's position is that there was plenty of evidence here from which to infer knowledge. And we can start... And the knowledge is that they were in the room when the obliteration occurred? That's certainly one category of evidence that the government, you know, has. Mr. Mumma, which I believe the jury credited, said that he went with Mr. Engi and Mr. Fongu eight out of ten times that they went to the lab, thought the three of them were together. You know, Mr. Chida was also there often, according to Mr. Mumma. And, you know, he also testified as to the distinctive loud noise that the grinder made. And he said it would take up to five minutes to rather grind each of the identifying marks off of each of the firearms. And this was a very attention-grabbing act. Mr. Mumma, you know, aside from the noise that the grinder made, Mr. Mumma was in special goggles, he was in special gloves. He did testify that he could see the people in the other part of the basement when he was back in the room grinding, which of course permits a reasonable inference that other people could see him. And that's on page 936 and 937 of the appendix. Was there any testimony that he discussed the grinding process with them at all? Any evidence? No, Your Honor. There's no direct evidence here, but, you know, that's of course not required. A jury is permitted to I thought he was given an instruction to carry on the grinding in the presence of the others. Yes, in the presence he and Mr. St. Michael had a conversation in the presence of two of the defendants about the obliteration, and of course that is yet another piece of evidence from which What was the conversation? The evidence is that Mr. St. Michael assigned Mr. Mumma the task of obliterating the firearms in the presence of the defendants. And, you know, I'm far away with it, you know? What was the evidence? We don't have exact... It's not in the record, is it? No, but of course we know the size of the... We know how? Through the evidence? Yes, yes Your Honor, the jury had the video of the evidence I'm sorry, of the lab. Agent Matney took the video and introduced it and you know, she walks down the stairs and goes through the lab Was there a question they were in the lab? Of course I'm talking about the connection with the grinding. So, I mean, the grinding took place in the lab So, therefore, their presence was enough? Is that your... It must be their presence in the lab was enough, right? I think it's sufficient for a reasonable juror to infer that they knew what was going on. That they knew that Mr. Mumma was obliterating serial numbers off of firearms. But, Your Honor, that's not all the evidence that the government has. It, of course, behooves defendants to take each piece of evidence piecemeal or each category of evidence piecemeal but, you know, the question is what does the complete picture represent? They were putting all kinds of things in the storage right? Supplies, medical things, things that sustain people. So, if you talk about the whole thing, if anybody's narrowing it down, it's the government. Well, I think those sort of humanitarian aims took place outside of the basement. And the testimony is undisputed on that point. Inside the basement is where all of the concealment happened. I would just point again to the depth of all the defendants' involvement in this long-running, close-knit conspiracy in which concealment was the name of the game. We, of course, have the bylaws drafted by Mr. Tita that talk about concealment being the priority of the group and what's the word he used, our most secret prize possession. Prize possession is concealment. And, of course, those same bylaws also distinguish between council members and non-council members. All the defendants in this case were council members. They were no mere stooges of a conspiracy. They all had leadership-like roles. You know, Mr. NGU's taking minutes. Mr. Tita was meeting with investors. You know, the defendants were deeply involved in this conspiracy. And that's another piece of evidence that could be sufficient on its own but certainly in tandem with the defendant's presence in the basement from which a reasonable juror confirmed that the degree of their involvement in the conspiracy means that they knew or must have known or deliberately avoided knowledge of the obliterated firearms. I also want to point out that Mr. Fongu and Mr. NGU testified and I think some of their testimony was really quite incredible. They disavowed, blanketly disavowed knowledge of many things. Of, you know, what the paperwork would have said, what the licensure procedure was. I think the jury was entitled to view some of their particular testimonies as again, you know, another way to infer that, you know, they're not telling the whole truth. They knew what was going on. And, you know, on that point I will quote Mr. Muma as saying, all of us knew, this is a direct quote from 937, all of us knew what was being done in the basement is what he said. What about the enhancement for the Yes. 28 weapons or more? More than 25? Yes, more than 25 and you know, I think the application of that guideline is really quite straightforward. It asks whether the offense involved more than a certain number of firearms. And so... But you have to use the offense of conviction, don't you? And what they were convicted of is just one or more. Well, so the offense, yes, means offense of conviction or relevant conduct and we don't need to leave It's the offense of conviction here, right? Yes, that is the government's position. We don't need to look at relevant conduct But it was convicted of just one or more. There's no evidence allowed that the amount that he was charged to get to the level of sentencing. Is that a problem here in this case? Your Honor, I don't think that's a problem here. I would say that the determination that the jury was required to make is a different determination than sentencing accountability under this particular guideline which again only asks whether the offense involved. And I would note also that the offense of conviction is defined in the guidelines as the offense, and I quote, the offense conduct charged in the count of the indictment or information of which the defendant was convicted. And so I think there was more than enough here based on, of course, what was charged the offense conduct charged What was he convicted of that would give you 28 weapons were involved? So, you know, we don't know if the jury made any particular findings Exactly, that's the problem Yes, but, you know, again, what the jury was asked You have to find some quantities that justifies that conviction. Here what he was convicted of is one or more How do you get to that level where he went to by that conviction? Well, again, I think the factual finding that the jury was required to make is a different is a different determination than the one the court was required to make. It only needed to ask and find whether more than 25 firearms were involved Maybe the jury found there was one That's all they had to do, one Right, and the district court was entitled to find that there was more involved It didn't have to rely on the jury How do you detect women based on the conviction? Based on the trial evidence It's the conviction, isn't it? I'm sorry, I didn't It's the conviction that we're looking at How do you determine that quantity of drugs based on what he was convicted of? Well, again, you know, whether an offense involved is a certain number of firearms is a different question than whether, you know, the defendants You're saying You can stray in terms of what's involved Even if you're convicted of an offense that's three grams of cocaine You can say, well, what I sentenced you involved three keys somewhere out here Why don't you stretch that beyond what was convicted It was a jury trial They made those convictions, you put it before them Now you're saying you can sentence it and enhance it Isn't that a problem? Well, I do think that there are determinations that a district court makes that are different and distinct from the conviction I think there are a number of enhancements What you're trying to say, I think and not saying it too clearly is that the enhancement is a finding that has to be made by the court based on what the court heard and saw That's right The jury was not asked to find a number The jury would just find whether firearms, the serial numbers were obliterated So the court determines as a matter of sentencing whether the amount involved in that conviction, a number of arms exceeded 25 and the court found that it did and implied the enhancement Does it have to be proven? It has to be proven, doesn't it? By a preponderance standard, yes For a sentencing enhancement Yes, your honor But you have to go by what's convicted of They almost got an apprentice problem in the sense that that changes because if it was one that wouldn't qualify for the level for the level that he enhanced I think theoretically if the jury convicted only of one firearm which of course we don't know that doesn't preclude the district court from later making a sentencing determination that more than just one firearm was involved in the offense and I apologize This wasn't a departure No, it was an enhancement Based on the jury at least would have to show that in terms of what he was convicted of in terms of that You can just go ahead So you're saying basically the judge could say well, I'm going to sentence him based on a thousand weapons Well, of course the judge would have to make a finding that a thousand weapons were involved in the offense and the district court here said the trial evidence showed that more than 25 firearms were involved in this offense Of course, that's not just because the offense conduct charged included a list of 28 firearms on count 4 and 39 firearms on count 5 but the trial evidence proved that up In fact, defendants did not dispute that the number of firearms that were recovered from the shipping container nor the number of firearms that had obliterated serial numbers and so I do think that the application of this guideline is really relatively straightforward Does the offense conduct as charged and as proven at trial involve more than 25 firearms And the same is true you know, lest I move on without addressing the same is true for the second enhancement We have just been talking about 2K21B1C and there was a second enhancement under subsection B5 that the defendant engaged in the trafficking of firearms increased by four levels and I think here defendants don't even dispute that they transported firearms What they really dispute is that whether they knew the firearms that they transported had serial numbers that were obliterated and so I think the second enhancement here was appropriate as well Let's see I honestly if the court has no further questions I am just over 5 minutes but I am happy to stand on the briefs and to cede the rest of my time unless the court has any other questions Thank you Alright, I think we now go to Ms. Trodden, right? Thank you, Your Honor Can I just jump in and ask you a question about the enhancements the sentencing enhancements Was it the defendant's position that is it the defendant's position that it's an apprendee violation to apply enhancements on a preponderance standard based on relevant conduct found by the judge the district court? I'm just confused as to what the argument is as to the enhancements now. I didn't understand the defendants to be making that argument No, we're not making that argument It's not about apprendee It's really about two things One is the mismatch that Judge Gregory captured between the offense of conviction where the jury only had to find at least one firearm and the enhancements which required specific numbers. Why is that a problem if the district court can find that this offense involved the right number of firearms as relevant conduct? The district court can find that but that's not actually what the district court found here when you look at the transcripts and the sites in the briefing, what the district court relied on was the simple fact of the convictions in this case and so they didn't actually make the specific findings needed given this disputed issue and given the government's burden to prove that this actually amounted to relevant conduct as to each of the defendants That's not an Evans argument It is an Evans argument So that's the second That's the second argument That's the second argument So there's two different arguments There's a mismatch and then there's also the Evans argument with respect to the fact that congruent liability which was a basis for the conviction is broader than guidelines liability and in addition I would point out that subsection B-5 relevant conduct specifically narrows the relevant conduct that the court can consider to not include jointly undertaken criminal activity and the district court didn't wrestle with that at all On the Evans argument I think I've heard several several times already today Look, no one, everybody admits that the defendants knew about the guns What they didn't know is that they were obliterated. This just doesn't seem like an Evans case to me where the defendant's argument was this is a spoken hub conspiracy It would be as if one of your clients said, look, I my only interaction with this conspiracy is I sold them one gun The full extent of my involvement in this conspiracy had to do with one gun sale so you can't charge me with knowing about the other 28 No one is saying that here. Everyone is saying, yeah, yeah I knew about the guns, plural I just didn't know they didn't have a serial number So I'm not seeing how this is an Evans problem. I think it's an Evans problem because of the nature of the guideline which is looking at not the guns in total but the guns with obliterated serial numbers No, that's not the guideline It just says firearms involved In other words, it's a factual finding that if there's more than 25 firearms involved in the offense then you enhance But if this was obliterated firearms Exactly, your honor. Yeah, that's the difference This is not just generally firearms That was specific What's the language of the enhancement? Um I don't have it in front of me, your honor Um Uh I understand Okay, thank you Mr. Wagner May it please the court I'd like to point to the Ravenel case Um 2023 case from this court gave this quote Instructing the jury clearly regarding the law to be applied to the case is a prerequisite of fulfilling the Sixth Amendment's promise of trial by an impartial jury Without proper instructions as to the law, the jury becomes mired in a factual morass unable to draw the appropriate legal conclusions based on the facts This jury was instructed under Pinkerton that if the defendant could have reasonably foreseen that the substantive crime might have been committed, then the jury must find the defendant's guilty Under willful blindness The jury was instructed that there needed to be evidence that the defendants deliberately ignored clear indications of wrongdoing There was no such evidence The jury was also instructed as to inferences that could be drawn under the conspiracy count to find that it was a knowing engagement in the conspiracy And then there was the aiding and abetting instruction on top of that You put those all together and the standard to which the government was held was below that of a reasonable doubt We would ask that you reverse this case and remand to the district court due to the improper jury instructions Thank you Mr. Heisley One minute for Roberta Woolsey Your honors, thank you for hearing us today Again, I go back to the joint appendix where the trial court, and I quote, stated that the expert can't come in and offer testimony that is essentially supposed to prove the defendant's state of mind That is complete contradiction to the holding in DS v. United States The government was allowed to introduce this exact type of evidence I thought your argument was the objection to your expert being excluded Did you object to the government's expert? Is that on appeal? No, your honor, we're arguing that our expert was excluded I know, but that doesn't, we shouldn't have to now go into whether the government's expert was properly admitted or not because that wasn't preserved and is not argued and we haven't looked at the circumstances but the question is whether the court properly excluded your expert Of course, your honor With respect to the statement proffered Of course, your honor What I'm saying, your honor, is for the exact reason that our expert was excluded is the reason that the government's expert in DS was allowed. We made no objections to the government's expert below in that regard that we're raising here, but what we're saying is that equal standards should apply to both the defense and the prosecution, and that's exactly what Justice Jackson said in her concurring in DS that this type of analysis under 704B can benefit defense attorneys and their use of experts as well. So we're asking that the rules apply equally to both government experts and defense experts and so that our clients can have a fair trial. Thank you Thank you We have several appointments of people who are represented by appointment or by pro bono various voluntary work support in our system and I really want to recognize that it's so important I'm proud of our American system where we bring defendants in and we give them the same level of defense that the government has and you guys have done a nice job. We'll come down and greet counsel
judges: Paul V. Niemeyer, Roger L. Gregory, Pamela A. Harris